IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 1:20-cr-196-AJT-7 |
| ) | |
| REINA ELIZABETH HERNANDEZ, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OPINION & ORDER

In August 2020, Defendant Reina Elizabeth Hernandez ("Hernandez") was indicted on two charges:[1] (1) conspiracy to sex traffic a minor under age 14 or a person via force, fraud, or coercion in violation of 18 U.S.C. §§ 1591(a), (b)(1), and (c) (Count 4 of the Superseding Indictment) and (2) sex trafficking a minor under age 14 in violation of 18 U.S.C. §§ 1591(a), (b)(1), and (c) (Count 5 of the Superseding Indictment). [Doc. No. 48]. On June 23, 2022, following a jury trial of Hernandez and six of her co-defendants, Hernandez was acquitted on Count 4, the conspiracy charge, but found guilty of aiding and abetting on Count 5, the substantive sex trafficking charge. She subsequently filed a Motion for Judgment of Acquittal, which the Court denied. [Doc. No. 510]. Hernandez then sought leave to file out of time a Motion for a New Trial under Fed. R. Crim. P. 33, which the Court granted. [Doc. No. 525]. The Court also deemed filed her proposed Motion for a New Trial (the "Motion"), attached to her Motion for Leave. [Doc. No. 515-1].

The Motion presents centrally whether a new trial is warranted where Hernandez's conviction was primarily based on the victim's demonstrably impaired recollections of her trafficking, and Hernandez's purported role in it, and where substantial exculpatory evidence exists, including from the Government's cooperating co-conspirator witnesses. The Motion has

---

[1] A superseding indictment in April 2022 charged Hernandez with the same offenses. [Doc. No. 253].

1

been fully briefed and a hearing on it was held on April 14, 2023, following which the Court took the Motion under advisement. Upon consideration of the Motion, the memoranda in support thereof and opposition thereto, the argument of counsel, and for the following reasons, the Motion is GRANTED.

## I. BACKGROUND

### A. Offense Conduct and Related Background

On August 27, 2018, Victim E.B., then 13 years old, ran away from a group home for children in Virginia. [Doc. No. 415] (the "PSR") at ¶ 28.[2] In the days that followed, E.B. had multiple interactions with MS-13 gang members, wanted to become a member of the gang, and was ultimately beaten with a metal bat as part of a gang initiation process. *Id.* at ¶¶ 32-39.[3] E.B. later identified herself as an MS-13 gang member and was sometime thereafter again beaten with a bat for violating the gang's rules. *Id.* at ¶¶ 41, 54.[4]

Between the time that E.B. escaped from the group home on August 27, 2018 and when she was recovered by law enforcement on October 11, 2018, she was sex trafficked on numerous occasions at different locations, orchestrated principally by co-defendant Luis Alberto Gonzales ("Gonzales").[5] *Id.* at ¶¶ 59, 61.[6] Social media communications and other phone records reveal many of these instances. *Id.* at ¶ 62.[7] E.B. was first trafficked in Virginia and then brought to Maryland from Virginia by Gonzales, where she initially stayed at the apartment of Nelson

---

[2] *See also* [Doc. No. 358] at 114:14-17, 117:1-3; [Doc. No. 368] at 131:5-132:10.
[3] *See also* [Doc. No. 358] at 124:10-18 (E.B. testifying, in part, that she was told that to become a member of the gang, "they had to beat you with a bat; two, they had to jump you in; and three, you had to have sex with I don't know how many"); [Doc. No. 368] at 164:11-22, 165:15-24.
[4] *See also* [Doc. No. 360] at 21:25-23:2, 38:14-39:7
[5] Gonzales was found guilty of conspiracy to sex traffic a minor, sex trafficking of a minor, and conspiracy to transport a minor with intent to engage in criminal sexual activity. [Doc. No. 470]. He was sentenced to 25 years in prison. *Id.*
[6] *See also* [Doc. No. 360] at 41:23-25, 52:13-18, 53:6-7, 53:18-54:5, 60:12-13, 65:6-7, 66:12-16.
[7] *See also, e.g.*, [Doc. No. 345] at 76:23-77:3, 77:18-22; [Doc. No. 363] at 49:15-58:3.

Caballero Portillo[8] ("Caballero"), who testified for the Government, until Caballero kicked Gonzales and E.B. out of the apartment because of his concern that he would get into trouble with either the police or MS-13 due to E.B.'s presence. *Id.* at ¶¶ 62, 90-100.[9] Gonzales knew Jonathan Rafael Zelaya-Veliz[10] ("Jonathan"), Hernandez's son-in-law, and Kevin Orlando Veliz[11] ("Kevin"), Hernandez's minor son; Gonzales then transported E.B. to Hernandez's apartment, where the two of them stayed for a period of time. [Doc. No. 360] at 65:2-7; [Doc. No. 363] at 157:1-4; [Doc. No. 365] at 49:12-13; 53:14-17; 62:15-16.

According to E.B. and/or the Government's two cooperating witnesses, and as largely reflected in the numerous Facebook messages and other communications, E.B. was trafficked, at a minimum, (1) in Woodbridge, Virginia, inside and outside the apartment of co-defendants Moises Orlando Zelaya-Veliz[12] ("Moises") and Jose Eliezar Molina-Veliz[13] ("Jose"), including with five or more men in the woods near that apartment and with Moises and Jose inside the home, *id.* at ¶¶ 65-67[14]; (2) in Woodbridge, Virginia, at the home of co-defendant Santos Gutierrez Castro[15] ("Santos"), where she had sex with ten or more men in an apartment bedroom, *id.* at ¶ 79[16]; (3) in Greenbelt, Maryland, at Caballero's apartment where she had sex with at least three men, including Caballero (a Government witness), Orlando Salmeron Funez[17] ("Salmeron") (a

---

[8] Caballero pleaded guilty to sex trafficking of a minor and was sentenced to 6.5 years in prison. [Doc. No. 554].
[9] *See also* [Doc. No. 365] at 43:15-44:1, 47:13-48:7, 50:16-18, 57:9-58:8, 62:3-14.
[10] Jonathan was convicted of conspiracy to sex traffic a minor, sex trafficking of a minor, and conspiracy to transport a minor with intent to engage in criminal sexual activity. [Doc. No. 474]. He was sentenced to 15 years in prison. *Id.*
[11] Kevin was not charged in the indictment but is an alleged co-conspirator.
[12] Moises was convicted of conspiracy to sex traffic a minor, sex trafficking of a minor, and conspiracy to transport a minor with intent to engage in criminal sexual activity. [Doc. No. 464]. He was sentenced to 22 years in prison. *Id.*
[13] Jose was convicted of conspiracy to sex traffic a minor, sex trafficking of a minor, and conspiracy to transport a minor with intent to engage in criminal sexual activity. [Doc. No. 466]. He was sentenced to 15 years in prison. *Id.*
[14] *See also* [Doc. No. 345] at 147:25-148:7; [Doc. No. 358] at 42:19-43:15; [Doc. No. 360] at 25:7-16, 27:10-28:16, 28:20-30:14.
[15] Santos was convicted of conspiracy to sex traffic a minor, sex trafficking of a minor, and conspiracy to transport a minor with intent to engage in criminal sexual activity. [Doc. No. 468]. He was sentenced to 15 years in prison. *Id.*
[16] *See also* [Doc. No. 360] at 32:3-35:21; [Doc. No. 363] at 71:12-13.
[17] Salmeron pleaded guilty to sex trafficking of a minor and was sentenced to 6.5 years in prison. [Doc. No. 356].

Government witness), and Gilberto Morales[18] ("Morales"), all of whom paid money to Gonzales, *id.* at ¶ 90[19]; (4) with at least Morales, at another apartment the same night that E.B. was trafficked at Caballero's apartment;[20] (5) according to E.B., in Mount Rainier, Maryland, at Hernandez's apartment with multiple men,[21] *id.* at ¶ 104[22]; and (6) at the apartment of another man, Incho, after Gonzales and Salmeron drove her there from Hernandez's apartment and waited outside, during which time E.B. took a video of the sexual encounter, *id.* at ¶ 120.[23] Upon E.B.'s recovery, a medical examination revealed a sexually transmitted infection and serious complications arising from it. *Id.* at ¶ 128-29.[24]

### B. Evidence Against Hernandez Presented at Trial

Briefly summarized, the following evidence was offered at trial against Hernandez:

1. Hernandez, age 48 at the time of the offense conduct, resided in an apartment in Maryland, where she lived with her two minor daughters, her minor son Kevin, and her adult daughter and her daughter's husband, co-defendant Jonathan, whose brothers are co-defendants Moises and Jose, and unindicted alleged co-conspirator Victor Alexis Emanuel-Veliz ("Victor"). [Doc. No. 358] at 41:12-42:12, 43:6-11, 44:8-12; [Doc. No. 360] at 30:18-31:7, 64:4-65:7. [Doc. No. 362] at 61:14-22. As characterized by the government, she had a "long-standing on-again, off-again romantic relationship with co-defendant Gilbert Morales," [Doc. No. 387] at 9, had known Salmeron for over a decade, and rented to Gonzales. [Doc. No. 358] at 37:7-25.

---

[18] Morales was found guilty of conspiracy to sex traffic a minor and sex trafficking of a minor. [Doc. No. 472]. He was sentenced to 16 years in prison. *Id.*
[19] *See also* [Doc. No. 358] at 55:3-21; [Doc. No. 365] at 45:15-24, 59:21-24, 60:12-61:4.
[20] There are few details about this instance, but Caballero testified that the same night E.B. had sex with him, Salmeron, and Morales at his (Caballero's) apartment, E.B. was at another "party" at Morales' cousin's house, where she also had sex with Morales. [Doc. No. 365] at 61:5-9.
[21] E.B's testimony in this regard was not corroborated by any other evidence, including the testimony of the Government's cooperating witnesses or electronic communications.
[22] *See also* [Doc. No. 358] at 56:5-7; [Doc. No. 360] at 41:2-42:21; [Doc. No. 363] at 214:9-10.
[23] *See also* [Doc. No. 345] at 74:4-75:8; [Doc. No. 358] at 72:8-73:23; [Doc. No. 363] at 195:7-198:16, 202:7-203:13, 204:13-205:23, 222:6-8; [Doc. No. 368] at 153:3-20.
[24] [Doc. No. 362] at 51:2-11.

2. E.B. identified Hernandez and stated she (E.B.) spent about ten nights at Hernandez's apartment. [Doc. No. 360] at 40:23-41:9.

3. E.B. testified that while at Hernandez's apartment, men visited to have sex with her, Hernandez was present when this occurred, and E.B. heard Hernandez providing the apartment's location to men prior to their arrival. *Id.* at 42:1-10. E.B. also testified that men would either give her money that she would give to Hernandez, or they would give the money to Hernandez directly. *Id.* at 46:11-47:5.

4. E.B. testified that Hernandez purchased underwear and bras for her so that she would look good for the men she had sex with. *Id.* at 47:17-25.

5. E.B. described Hernandez's apartment and those who lived there, including Jonathan and his wife (Hernandez's daughter), her son Kevin, and Hernandez's other two minor daughters. *Id.* at 93:23-94:19.

6. E.B. testified that Kevin paid to have sex with her; however, E.B. could not remember if they had sex at Hernandez's apartment. [Doc. No. 365] at 50:9-51:21; 53:7-17; 64:6-65:10. E.B. also could not remember whether Hernandez worked full-time while E.B. stayed at the apartment, and first said she did not see, but then said she did not remember seeing, any of Hernandez's minor children at the apartment. [Doc. No. 360] at 95:6-8, 97:19-98:10, 103:14-19.

7. E.B. testified that co-defendant Gonzales, who she identified as her boyfriend, slept with her in Hernandez's living room, during which time they had sex approximately twice, though Gonzales did not pay to do so. [Doc. No. 360] at 52:1-53:5.

8. E.B. testified she received from Hernandez those clothes reflected in two photographs that E.B. took of herself in Hernandez's bathroom, Government Exhibits 154A and 154C, and one of the outfits she was wearing was Hernandez's dress. *Id.* at 49:3-50:8.

9. Co-defendant Nelson Caballero Portillo ("Caballero") testified that he overheard Hernandez claim that Gonzales was playing well in a soccer game because he was satisfied in bed with E.B. [Doc. No. 365] at 64:2-7. Caballero also testified that Gonzales told him that Hernandez warned Gonzales that E.B. would cause trouble because she was a minor. *Id.* at 69:21-70:2.

10. After Caballero kicked E.B. and Gonzales out of his apartment, E.B. and Gonzales stayed at Hernandez's apartment for at least a week and up to a month. *Id.* at 62:3-63:4; [Doc. No. 358] at 65:6-9, 69:8-10.

11. On one occasion, co-defendant Salmeron and Gonzales drove E.B. from Hernandez's apartment to another man's apartment (Incho's) where she had sex with Incho and recorded herself doing so. [Doc. No. 358] at 71:13-73:23.[25] E.B. was recovered by authorities from the area outside of Hernandez's apartment later that same evening. [Doc. No. 345] at 74:4-75:8; [Doc. No. 363] at 222:6-8; [Doc. No. 368] at 153:3-20.

12. Facebook communications reveal E.B. was sex trafficked during the time range when the Government contends she was harbored at Hernandez's apartment. [Doc. No. 387] at 19 (quoting text messages between co-defendants, but not Hernandez, from September 24, 2018 through October 11, 2018 that discussed trafficking E.B.).

13. In an interview with law enforcement following her arrest in 2020, Hernandez, who was present in the United States without legal status, denied knowing E.B. and four co-defendants. [Doc. No. 362] at 62:17-66:5.

---

[25] Evidence placed Gonzales, Salmeron, and E.B. outside of Hernandez's apartment less than an hour before E.B. sent the video of herself having sex with Incho to Gonzales. [Doc. No. 363] at 195:7-198:16, 202:7-203:13, 204:13-205:23. Kevin was also outside of Hernandez's apartment at that same time, *id.* at 204:24, but Salmeron did not identify him as present when E.B. was trafficked at Incho's apartment.

14. Hernandez suggested in a Facebook message that she was a gang member by telling a co-defendant to "Let La Mara sleep"[26] and that she was a "marera."[27] Gov't Ex. 172 at 3 and 173.

Significant for the purposes of assessing the credibility of E.B.'s testimony, and as discussed in greater detail below, is that there was no evidence, from E.B. or any other source, that Hernandez was in any way involved in E.B.'s trafficking before E.B. arrived at Hernandez's apartment after being kicked out by Caballero. Thus, distilled to its essence, E.B.'s testimony as to Hernandez is that one day, after being trafficked in Virginia, she was taken directly to Hernandez's apartment in Maryland,[28] where on that same day, and only on that day, and without having previously been involved in E.B.'s trafficking, Hernandez, a mother in her late forties residing with her two minor daughters, minor son, adult daughter and daughter's husband in a "very small apartment," where one room was only separated by a curtain, directed men to her apartment and collected payment from them to have sex with E.B.

## II. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Due process demands that a defendant's guilt in a criminal proceeding must be established with proof beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *see also id.* at 363 (noting the standard "is a prime instrument for reducing the risk of convictions resting on factual error" and "indispensable to command the respect and confidence of the community"). The Fourth Circuit has counseled that

---

[26] "La Mara" is a reference to La Mara Salvatrucha, otherwise known as MS-13.
[27] The Government's translation of "marera" is a "female gangster." Gov't Ex. 173.
[28] That E.B. was taken directly from Virginia to Hernandez's apartment is demonstrably false. *See*, *infra*, p. 12-13. Instead, she was taken to Hernandez's from Caballero's Maryland apartment after being unexpectedly kicked out. *See*, *infra*, p. 6, 12-13.

> [i]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington*, 757 F.2d 1484, 1485.[29] That a court submitted the case to a jury or denied a motion for judgment of acquittal is not incompatible with granting a new trial because:

> [t]he trial judge, who like the jury had the advantage of observing the witnesses as they testified, is vested with broader power. Even when there has been substantial evidence which required him to submit the case to the jury, he may in his discretion set the verdict aside and grant a new trial if he thinks the verdict is against the weight of the evidence, and it is his duty to do so if he is convinced that permitting the verdict to stand would result in a miscarriage of justice.

*United States v. Shipp*, 409 F.2d 33, 36-37 (4th Cir. 1969). Other circuits have held similarly.[30] However, notwithstanding the court's power to grant a new trial, new trial motions are disfavored and should be granted sparingly, in part due to the historic deference afforded to jury verdicts. *United States v. Ali*, 991 F.3d 561, 570 (4th Cir. 2021) (citations omitted).

The Fourth Circuit discussed the applicable standard for granting a new trial motion in a recently published opinion affirming the grant of a new trial:

> A new trial . . . may be granted where the government *has* presented sufficient evidence for a reasonable jury to convict, but the court nevertheless disagrees with the jurors' weighing of the evidence in finding the defendant guilty. So in determining whether a new trial is warranted, the district court—sitting as a thirteenth juror—conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor . . . . [T]he district court is permitted to conduct its own assessment of witness credibility and to re-weigh the evidence to determine whether a new trial is warranted. And the court may properly conclude that a new trial is warranted based on the cumulative weight of the evidence . . . . The key question in determining whether a new trial is

---

[29] In *Arrington*, the Fourth Circuit affirmed a district court's denial of a Rule 33 Motion, in part because "[p]roof of [defendant]'s guilt did not rest wholly on the testimony of the witness whose credibility [defendant] attacks." 757 F.2d at 1486.

[30] "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *United States v. A. Lanoy Alston*, 974 F.2d 1206, 1211-12 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 3119 (8th Cir. 1980)).

> warranted under Rule 33 is not what *kinds* of evidence support the verdict, but the *weight* of that evidence . . . . The ultimate test of whether a new trial is warranted is whether letting a guilty verdict stand would be a manifest injustice. And a guilty verdict can effect a manifest injustice regardless of the nature of the evidence supporting it.

*United States v. Rafiekian*, No. 22-4252, slip op. at 15-16, 20, 22 (4th Cir. May 18, 2023) (internal citations and quotations omitted) (emphasis in original).[31]

### III. ANALYSIS

Mindful of the deference that must be afforded to the jury's determinations, the Court, after careful consideration of all the evidence, including any inferences to be drawn from the evidence and witness credibility, concludes that allowing the verdict against Hernandez to stand would be a manifest injustice, that the evidence weighs heavily against the verdict, and that the interest of justice[32] demands a new trial. *See Rafiekian*, No. 22-4252 slip op. at 15-16, 20, 22; *Arrington*, 757 F.2d at 1485.

**A. Credibility Issues with E.B.'s Testimony**

The jury acquitted Hernandez on the conspiracy charge, and her aiding and abetting conviction on the trafficking charge necessarily rests upon the finding that Hernandez knew of

---

[31] In explaining why an abuse of discretion standard applies, the Fourth Circuit summarized the following "good reasons for our appellate deference to the trial court[]":
> We as appellate judges do not experience the tenor of the testimony at trial. The balance of proof is often close and may hinge on personal evaluations of witness demeanor. Thus, particularly where the district court's decision rests on discretionary assessments of the balance of the evidence, [the Fourth Circuit] owes the great deference commanded by the traditional power of trial judges sitting as thirteenth jurors to avoid possible miscarriages of justice by ordering new trials in criminal cases . . . . [W]e are mindful that a district court's power to grant a new trial was effectively absolute until a 1984 amendment to 18 U.S.C. § 3731 gave the government the right to appeal new-trial orders. And nothing about that amendment suggests that it was intended to significantly curb the district court's historically unreviewable discretion in ordering new trials.

*Id.* at 16-17.

[32] As this Court, Judge Ellis presiding, has previously explained,
> the meaning of the phrase in 'the interest of justice' in the context of Rule 33 is not difficult to discern; the phrase's plain meaning makes unmistakably clear that granting a new trial is discretionary, and the cases reflect that this discretion should be exercised where it is demonstrated that the fundamental fairness or integrity of the trial result is substantially in doubt. The plain meaning of 'the interest of justice' would require no less.

*United States v. Jennings*, 438 F. Supp. 2d 637, 642 (E.D. Va. 2006) (footnotes omitted).

E.B.'s sex trafficking and substantially assisted in it. Evidence of that knowledge and substantial assistance consists almost entirely of E.B.'s recollections about the one occasion on which she was purportedly trafficked at Hernandez's apartment when Hernandez was present. The Government's case against Hernandez therefore rested nearly exclusively on E.B.'s testimony and her credibility, which figures centrally in assessing the weight of the evidence for the purposes of the Motion.[33] *See Rafiekian*, No. 22-4252, slip op. at 15-16, 20 (noting the district court is empowered to weigh whatever evidence supports the Government's case upon the court's own *de novo* consideration of the evidence and a witness's credibility).

Based on all the evidence, and the Court's assessment of E.B. as a witness, the Court has substantial doubts as to the credibility and reliability of her testimony against Hernandez. The Government's evidence against Hernandez, as provided by E.B., was substantially undermined by E.B.'s various admissions, statements, and inability to recall basic aspects of her direct examination testimony on cross-examination. For example, E.B. agreed on cross-examination that she was using "lots of drugs" at that time and her memory was "fuzzy, or not good." [Doc. No. 360] at 98:22-24; [Doc. No. 365] at 31:10-11. She also conceded that she was brought to many different apartments but struggled to remember them. [Doc. No. 360] at 94:23-95:2, 98:11-24. At one point, she testified that she did not remember whether she saw or heard men give money to Hernandez on the one occasion she was purportedly trafficked at Hernandez's apartment when

---

[33] As the Second Circuit has articulated, albeit in the civil context, there is
> tension that exists when granting a motion for a new trial between two conflicting principles: the parties' [constitutional] right to a trial by jury and the power of the district court, also necessary to our jury system, to set aside a seriously erroneous verdict based on the weight of the evidence. This tension is most acute where . . . the result may turn in large part on the credibility of a single witness. While this makes the trial court's task in ruling on a new trial motion more difficult, it does not preclude the possibility that the motion may be granted.

*United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998).

Hernandez was present,[34] and ultimately conceded that she could not even remember whether the men gave money to Hernandez at all. [Doc. No. 360] at 97:10-16. In that vein, she also acknowledged that she did not "remember very well" how many men came to Hernandez's apartment, *id.* at 42:6-10, and while initially testifying that men came over in the morning, she later said she could not remember whether it was daytime or nighttime or whether it was light out. *Id.* at 95:9-96:3. She also originally testified that men had sex with her at Hernandez's apartment only on her first night there, but then testified, after she was twice shown her grand jury testimony, that she had sex with another man after the first night at Hernandez's apartment, but that Hernandez was not then home. *Id.* at 42:6-43:3, 65:21-66:18. Regarding the bras and underwear that E.B. said Hernandez provided her for the purposes of her trafficking, none of those items were introduced into evidence, and while numerous photos were recovered of E.B. over the course of the investigation, including compromising photos of E.B. in advertisements for her trafficking, there is no evidence in any photos of E.B. in the bras and underwear that Hernandez purportedly provided her. [Doc. No. 363] at 258:17-20. As to the photo of E.B. in a dress that she said Hernandez gave her, the Government's lead case agent testified the photos taken in Hernandez's bathroom were never posted online for prostitution purposes, and the dress is not of a sexual or risqué nature. [Doc. No. 363] at 257:5-258:20.

The credibility of E.B.'s testimony against Hernandez also suffered from what ultimately appeared to be the absence of any clear recollections about what actually happened and when. Overall, by the Court's count, E.B. answered "I don't remember" or "I don't know" more than 125 times, including with respect to some of her most damning core testimony concerning Hernandez's purported involvement in her sex trafficking. For example, E.B. testified that she was trafficked at

---

[34] Notwithstanding that on direct examination, she stated she saw them give money to Hernandez or Gonzales. [Doc. No. 360] at 47:10-11.

Hernandez's apartment her first night there, that she was taken to Hernandez's apartment on the first night she was taken from Virginia to Maryland,[35] and that men would either give her money that she would give to Hernandez or they would give the money to Hernandez directly. But as referenced above, on cross-examination, she could not even remember whether men gave money to Hernandez at all, or any attendant details as to whether it was day or night. Moreover, E.B.'s centrally inculpatory recollections of Hernandez's involvement were within the context of E.B.'s demonstrably inaccurate recollection that the only occasion on which she was purportedly trafficked at Hernandez's apartment while Hernandez was present[36] occurred when she was taken directly to Hernandez's apartment from Virginia. But as conceded by the Government's lead agent and according to GPS data, she was not taken to Hernandez's apartment directly from Virginia. Rather, she initially stayed at Caballero's apartment where, according to other evidence and testimony, what occurred there (and potentially also at Morales' cousin's apartment earlier in the night) was largely consistent with what she described as having happened at Hernandez's

---

[35] The evidence reflects that E.B. was twice taken from Virginia to Maryland; however, the evidence focused primarily on her second instance in Maryland. Nevertheless, the GPS data is outlined as follows: From August 29, 2018 to September 12, 2018, E.B.'s phone recorded 148 GPS location hits, the last being in Woodbrige, Virginia. Gov't Ex. 265 at 1-8. On the evening of September 12, 2018, a GPS hit was recorded in Montgomery Village, Maryland. *Id.* at 8. The next GPS hit was in Alexandria, Virginia on September 16, 2018. *Id.* This was followed by three additional GPS hits in Alexandria. *Id.* The GPS then hit again on the evening of September 19, 2018 in Falls Church, Virginia. *Id.* The next GPS hit was in Greenbelt, Maryland on September 22, 2018, followed by one more later that day in Greenbelt and three more in Greenbelt the next day. *Id.* Then, the GPS hit on the evening of September 24, 2018 at Hernandez's apartment complex, and then again about twelve hours later on the next day. *Id.* at 8-9. Notably, these dates reflect that the timestamps are in Coordinated Universal Time (UTC), not Eastern Standard Time (EST) or Eastern Daylight Time (EDT). [Doc. No. 345] at 146:8-16. Accounting for the time zone change, the times listed in the exhibit are four or five hours ahead of the time it would have been on the east coast. *Id.* The dates listed above reflect the time zone change, and there is no material difference as to whether a four- or five-hour adjustment is made.

[36] E.B. initially testified that she did not remember being trafficked at Hernandez's apartment other than the first night she was taken there. [Doc. No. 360] at 42:22-43:3 ("Q: And then after that first day, were there additional days when men came over to have sex with you at Reina's apartment? A: Not that I remember."). The Government then showed E.B. her grand jury testimony, following which she said she did remember that men would come to Hernandez's apartment to have sex with her beyond that day. *Id.* at 43:4-46:10. Thereafter, the Government showed E.B. a picture of a man in a yellow T-shirt and asked whether E.B. recognized him, and she answered in the affirmative. [Doc. No. 360] at 65:11-17. E.B. she said she met the man at Hernandez's apartment, but when asked whether "anything happen[ed] between you and him at Reina's apartment," E.B. replied "[n]ot that I remember." *Id.* at 65:21-25. The Government then again showed E.B. her grand jury testimony, following which E.B. stated that she had sex with the man at Hernandez's apartment, that the man paid Gonzales for it, and that Hernandez was not home at the time. *Id.* at 66:1-18.

apartment, all without Hernandez's presence or knowledge. In sum, as the Court detailed in its prior Order, [Doc. No. 408], E.B. provided implausible testimony with respect to the timeline of events regarding where she was first taken and sex trafficked in Maryland, clearly confusing Caballero and Hernandez's apartments.[37] As outlined in that Order,

> On direct examination, the Government elicited testimony from E.B., the minor who was sex trafficked, that she spent approximately ten nights at the Defendant's apartment, that on the first night there she engaged in commercial sex with about six or seven men . . . . [Doc. 360], 41:2-42:21, 46:11-47:10. On cross-examination, E.B. testified that when she was brought to Maryland from Virginia, the first place she was taken was to the Defendant's apartment.[2] *Id.* at 93:17-22. Accordingly, when taken as a whole, E.B.'s testimony is that she had sex with six or seven men on her first day at the Defendant's apartment in Maryland and that she had been taken to the Defendant's apartment directly from Virginia. But as the Government's lead case agent acknowledged on cross-examination, based on Facebook GPS data and testimony from a Government cooperator in the case, E.B.'s testimony that she went directly to the Defendant's apartment in Maryland from Virginia was demonstrably false. [Doc. 363], 274:7-10; 279:17-280:3. Rather, it was established that she was taken directly from Virginia to the Maryland apartment of co-defendant [Caballero]; and based on that otherwise uncontradicted GPS data evidence, any commercial sex that E.B. experienced on her first day in Maryland could not have taken place at the Defendant's apartment, but rather at Caballero's apartment. And in that regard, the Government presented evidence of E.B.'s sex trafficking with multiple men at Caballero's Maryland apartment, the location where she was first brought directly from Virginia. [Doc. 382], 50:15-22, 53:21-55:21.[3]

> [2] The evidence presented indicated that this trip—from Virginia to Maryland—was the second time during the offense period that E.B. was taken from Virginia to Maryland. [Doc. 363] [at] 266:17-267:8, 269:8-270:5, 271:14-272:6. This Order focuses exclusively on this second time E.B. traveled to Maryland.

> [3] In sum, as it relates to Caballero's apartment, the Government presented evidence establishing that (1) E.B. was taken directly to Caballero's apartment in Maryland from Virginia, (2) parties took place at Caballero's apartment, (3) when E.B. described having sex with six or seven men in law enforcement interviews, she talked about an apartment with a lot of people, and (4) at least three men engaged in commercial sex with E.B. at Caballero's apartment one night. [Doc. 358], 53:21-55:21; [Doc. 363], 271:20-280:12; Gov't Exs. 142, 145.

---

[37] The Government disputes that E.B. was ever confused between Caballero and Hernandez's apartments, noting she described a curtain used as a wall in Hernandez's apartment while no such curtain was used at Caballero's. [Doc. No. 536]. However, there is no dispute that E.B. was present at both apartments and thus her ability to describe the two apartments is unsurprising. Rather, what is at issue is her ability to accurately recall where she was sex trafficked.

[Doc. No. 408] at 1-2. Likewise, her recollection that she heard Hernandez and Gonzales on the phone soliciting customers echoes her testimony that she heard Santos on the phone soliciting customers while being trafficked in Virginia at Santos' apartment. In short, E.B.'s consistent inability to recall or know details on cross examination about her direct examination testimony against Hernandez constituted, in substance, an inability to even confirm that what she claimed happened, in fact, occurred.[38]

E.B.'s credibility with respect to Hernandez's involvement was otherwise substantially undermined. For example, E.B. did not dispute her use of alcohol and drugs, including cocaine, as a 13-year-old, and conceded that her memory was "fuzzy, or not good." [Doc. No. 365] at 31:10-11. FBI Special Agent Obie also testified that no digital communications between Hernandez and E.B. were ever uncovered in the hundreds of thousands of documents examined during the investigation. [Doc. No. 363] at 253:22-256:20.[39] Salmeron, a Government cooperating witness involved in E.B.'s trafficking who had known Hernandez for years, testified that he was unaware of any prostitution occurring at Hernandez's home. [Doc. No. 358] at 97:21-23. And Caballero, in whose apartment E.B. was trafficked with multiple men when brought to Maryland from Virginia, and who was also a Government cooperating witness, testified that he too never witnessed any

---

[38] At the April 14, 2023 hearing, the Government explained away E.B.'s memory issues as her simply "shutting down" in the face of defense counsel's questions on cross-examination. If true, this raises substantial issues concerning whether E.B. essentially became "unavailable" on cross-examination and the Court is thus required to disregard her testimony on direct based on Sixth Amendment confrontation issues. *See Lawson v. Murray*, 837 F.2d 653, 655 (4th Cir. 1988) ("When a prosecution witness cuts off cross-examination . . . the criminal defendant's constitutional right of confrontation is directly implicated"). Nevertheless, the Court has not disregarded any of her testimony, but has instead evaluated it holistically and weighed the apparent inconsistencies and contradictions.

[39] Government Exhibit 373 showed various Facebook profiles recovered from E.B.'s phone. [Doc. No. 363] at 254:20-255:6. While Hernandez's profile was pulled from E.B.'s phone, unlike other contacts that were listed as a "friend" under the section "interaction statuses," the "interaction statuses" section for Hernandez was blank. Gov't Ex. 373 at 1, 3. Agent Obie conceded that Hernandez's profile itself could have found its way onto E.B.'s phone merely as a suggested connection by Facebook's algorithm, rather than based on an actual interaction between the two of them, and that no Facebook messages between E.B. and Hernandez were ever uncovered. [Doc. No. 363] at 254:15-256:11. Moreover, even if E.B. and Hernandez were Facebook "friends," there is no dispute that the two knew each other. Therefore, the fact alone that E.B. and Hernandez were Facebook "friends," even if true, is not alone incriminating beyond the already known and established facts.

14

prostitution at Hernandez's house and that Hernandez was not present at his house when other men discussed sex trafficking E.B. [Doc. No. 365] at 98:23-99:3. Caballero further testified that Gonzales, who was centrally involved in E.B.'s trafficking, told him that the only reason Hernandez was included in this prosecution was because Hernandez "kicked [E.B.] out of [her] apartment," implying a lack of involvement by Hernandez and potentially suggesting some ill-will on E.B.'s part against Hernandez. *Id.* at 99:4-7. And Dr. Wolf, called by the Government as an expert on the psychological impact on human trafficking, testified on cross-examination that someone like E.B. could have complex post-traumatic stress disorder, which could cause dissociation and memory loss or alteration.[40] [Doc. No. 366] at 69:6-76:24.

Additionally, E.B.'s version of events changed dramatically through the course of the investigation and trial. Less than two weeks after she was recovered by law enforcement, and while still at the Fairfax Juvenile Detention Center, E.B. told law enforcement that a "Kevin,"[41] not Luis Gonzales, was centrally involved in her trafficking, including that "Kevin" first encouraged her to engage in sex trafficking and was her boyfriend; she repeated this story a week later to law enforcement, and in those initial interviews made no mention of Gonzales, who she identified in in her trial testimony as her principal trafficker and boyfriend. [Doc. No. 365] at 7:3-22, 8:16-9:9. She also told investigators that Jose and Sioni Alexander Bonilla Gonzalez[42] ("Sonic") drove her to Hernandez's apartment, that it was not Luis Gonzales, as she testified at trial, but Sonic who

---

[40] Dr. Wolf's testimony in this regard was not specific to E.B. or a diagnosis of her.
[41] The record is unclear whether that "Kevin" is Hernandez's son, Kevin Orlando Veliz, or Kevin Martinez, an unindicted co-conspirator who, based on Government Exhibit 200, was somehow involved in E.B.'s bat beating. Regardless of whether "Kevin" referred to Kevin Orlando Veliz, Kevin Martinez, or some other "Kevin," E.B.'s statements to law enforcement that "Kevin" was her boyfriend and principal trafficker is in stark contrast to her trial testimony where she identified Luis Gonzales as such. Moreover, were the "Kevin" referenced in E.B.'s initial law enforcement interviews Kevin Orlando Veliz, Hernandez' minor son, E.B's credibility is further called into question, given that, on direct examination, E.B. suggested that she may have first met Kevin at Hernandez's apartment, which occurred weeks after she was first sex trafficked. *See* [Doc. No. 360] at 64:4-5. (E.B. testifying, "I don't remember if [meeting "Kevin" for the first time] was at Reina's apartment.").
[42] Sonic pleaded guilty to two counts of assault with a dangerous weapon in aid of racketeering in connection with E.B.'s two bat beatings. [Doc. No. 413]. He was sentenced to seventy months in prison. *Id.*

15

with Hernandez would bring men to Hernandez's apartment for commercial sex and receive money from men, and that Kevin texted her (E.B.) and warned her to do everything that Sonic and Hernandez demanded.[43] *Id.* at 7:7:20-8:8-12. But E.B. largely abandoned this story at trial and it was otherwise contradicted by the Government's other witnesses. *See, e.g., id.* at 62:15-63:6. (Caballero testifying that Jimmy Lemus and Nixon Perez[44] drove E.B. and Gonzales to Hernandez's apartment, without mention of Jose or Sonic).

E.B.'s credibility and reliability as a witness was otherwise substantially undermined. In that regard, E.B. also testified on cross examination that she had previously admitted to law enforcement that she participated in the murder of another girl by hitting, kicking, and stabbing her; then, with two other gang members, transported the dead girl to Pennsylvania where they buried her. [Doc. No. 360] at 90:17-91:13. Three days later E.B. changed her story, first claiming she lied about murdering the girl and that the girl was still alive, and then stating that she couldn't remember the extent to which she had assaulted the girl and didn't know whether the girl died as a result of her attack. *Id.* at 91:19-92:5; [Doc. No. 365] at 14:1-15:9.

Absent E.B.'s testimony, the other evidence of guilt presented by the Government, including that related to Hernandez's purported consciousness of guilt,[45] gang affiliation,[46] and knowledge of the relationship between E.B. and Gonzales, has little residual weight, particularly in light of the Government's own witnesses who undermined the prosecution's case against

---

[43] The Court cannot find that text message among any of the documents admitted into evidence.
[44] Jimmy Lemus was not charged in the indictment. He lived with Caballero. [Doc. No. 365] at 51:6-7. Nixon, Lemus' boyfriend, also was not charged. *Id.* at 51:13-16.
[45] With respect to Hernandez denying knowledge of E.B. and co-defendants to law enforcement, Hernandez contends in her brief that her initial denial was the result of fear from an early-morning raid, her lack of legal status in the United States which led her to deny association with anyone she thought might be accused of wrongdoing, and her confusion based on the investigators' failure to contextualize their questions with date ranges given the significant period of time that had elapsed between the offense date and the arrest/interview. [Doc. No. 379] at 17-18.
[46] With respect to Hernandez's references implying that she was a gang member, Hernandez insists she was joking, [Doc. No. 379] at 18-19, and Caballero, a Government cooperating witness, explicitly testified that Hernandez was not in a gang, [Doc. No. 365] at 98:21-22.

Hernandez, namely testimony from Caballero and Salmeron that they were unaware of Hernandez's involvement in the trafficking and that she was not a gang member, and from Dr. Wolf about trauma's impact on memory. And the Government was unable to establish Hernandez's involvement through Facebook message records, as it did with respect to the other defendants.

In sum, E.B.'s uncorroborated testimony raises substantial doubts as to its credibility and reliability as to Hernandez, given (1) Hernandez' living situation in a small, crowded apartment with her minor children and the absence of any evidence or testimony by E.B. suggesting Hernandez was otherwise involved in E.B.'s trafficking; (2) E.B.'s undisputed use of alcohol and drugs, including cocaine, as a 13-year-old during her trafficking, and her admitted lack of clear memory; (3) Dr. Wolf's testimony about the ways in which sexual trauma can generally impact memories; (4) E.B.'s inability to answer questions on cross examination about some of her most damning direct examination testimony concerning Hernandez's purported involvement in her trafficking; (5) her inconsistent recollections about her trafficking as between her pre-trial statements to law enforcement and at trial; (6) her inconsistent statements concerning her involvement in the murder of another girl and her admitted participation in the same; (7) her impaired memory concerning precisely where she was trafficked and when, including, for example, whether she was trafficked at Hernandez's apartment on more than one occasion, her demonstrably false recollection that she was taken to Hernandez's apartment, rather than Caballero's, directly from Virginia,[47] and whether she was brought to any apartments besides Caballero or Hernandez's for sex, given substantial evidence that she was trafficked at locations

---

[47] E.B.'s description of her trafficking on her first night in Maryland, which she testified occurred at Hernandez's apartment, substantially describes what, in fact, happened at the place she actually went her first night in Maryland—Caballero and potentially Morales' cousin's apartments.

17

other than Caballero and Hernandez's apartments; (8) the lack of any mention of Hernandez's complicity, knowledge or involvement in E.B.'s trafficking in any of the thousands of electronic communications that passed between the other defendants concerning E.B.'s trafficking; and (9) the direct testimony of the Government's two cooperating witnesses, neither of whom implicated Hernandez and whose testimony was to a significant extent exculpatory. While there was other evidence from which guilt could be inferred, including Hernandez's statements to law enforcement denying that she knew E.B. or certain other co-defendants, those inferences are weak when viewed in light of the evidence as a whole, as detailed above. *See Rafiekian*, No. 22-4252 slip op. at 16 ("[T]he district court is permitted to conduct its own assessment of witness credibility and to re-weigh the evidence to determine whether a new trial is warranted"); *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (affirming a district court's grant of a new trial motion and noting that "the trial judge may intrude upon the jury function of credibility assessment . . . where testimony is patently incredible or defies physical realities") (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (internal marks omitted)); *see also United States v. Olazabal*, 610 F. App'x 34, 37-38 (2d Cir. 2015) (affirming a grant of a new trial because "the District Court was fully entitled to independently assess both the credibility of witnesses and other evidence in deciding the Rule 33 motion").

## IV. CONCLUSION

There is no doubt that E.B. endured horrific trauma at a young age; and her inability to recall or answer questions about basic, but critical, details with respect to her testimony about Hernandez's involvement may be explainable. But no matter how understandable E.B.'s memory lapses and confusion are, or how sympathetic the Court is to her plight, E.B.'s trauma cannot eliminate the conflicting evidence and substantial credibility issues that predominate in this case

18

against Hernandez, who is facing the long-term loss of her freedom.[48] In sum, the Court has substantial doubt about the fundamental fairness and integrity of the trial result as to Hernandez.

In reaching its decision, the Court recognizes that a new trial is to be granted sparingly with great deference to be afforded to the judgment of the jury. But after thoroughly considering all the evidence, notwithstanding the great deference to be afforded to the jury's assessment of the evidence, the Court finds and concludes that the evidence against Hernandez with respect to Count 5 of the Superseding Indictment weighs heavily against the verdict, that it would be unjust to enter judgment, that it would be a miscarriage of justice to allow the verdict to stand, and that the interests of justice demand Hernandez's conviction be vacated and a new trial be held. Accordingly, it is hereby

**ORDERED** that the Motion for a New Trial, [Doc. No. 515-1], be, and the same hereby is, GRANTED; and it is further

**ORDERED** that Defendant Hernandez's conviction on Count 5 of the Superseding Indictment be, and the same hereby is, VACATED; and it is further

**ORDERED** that a status conference be, and the same hereby is, SCHEDULED on Wednesday, July 19, 2023 at 9:00 a.m. to set a trial date should the United States elect to proceed with a new trial; and it is further

**ORDERED** that Defendant Hernandez remain in the custody of the United States Marshals Service pending further order of the Court.

The Clerk is directed to forward a copy of this Order to all counsel of record.

Alexandria, Virginia
June 16, 2023

Anthony J. Trenga
Senior U.S. District Judge

---

[48] As a result of her conviction on Count 5 of the Superseding Indictment (renumbered as Count 2 on the jury verdict form), Hernandez faces a mandatory minimum sentence of 15 years in prison with a guideline sentence of life.